UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES J. DECOULOS,

        Plaintiff,

        v.

TOWN OF AQUINNAH, the
AQUINNAH/GAY HEAD COMMUNITY
ASSOCIATION, INC., and the
COMMONWEALTH OF
MASSACHUSETTS,

        Defendants.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Civil Action No. 17-cv-11532-ADB

**MEMORANDUM AND ORDER ON MOTIONS TO DISMISS**

BURROUGHS, D.J.

    In 1997, Plaintiff James J. Decoulos, along with other similarly situated landowners, initiated litigation seeking easements by necessity to allow access to various landlocked parcels of land in the Town of Aquinnah. See Kitras v. Town of Aquinnah et al., Misc. Case No. 238738 (Mass. Land Ct. May 20, 1997) ("Kitras"). The Massachusetts Appeals Court and the Massachusetts Supreme Judicial Court ("SJC") reviewed Kitras on appeal, and on April 19, 2016, the SJC issued a final ruling that no easements by necessity exist. See Kitras v. Town of Aquinnah, 833 N.E.2d 157, 162 (Mass. App. Ct. 2005) ("Kitras I"); Kitras v. Town of Aquinnah, 49 N.E.3d 198, 202–04 (Mass. 2016), cert. denied, 137 S. Ct. 506 (2016) ("Kitras II"). During the nearly twenty years that Kitras was pending, Decoulos, either individually or as the trustee or beneficiary of various property-owning trusts, participated in other lawsuits seeking similar relief, including actions involving the parcel at issue here. After effectively being denied relief at each turn, Decoulos now sues the Town of Aquinnah (the "Town"), the Aquinnah/Gay Head Community Association ("AGHCA"), and the Commonwealth of Massachusetts for declaratory

judgment (Count I), unconstitutional taking (Count II), and violation of due process (Count III), all claims that essentially derive from the courts' or the Defendants' refusal to endorse his claim to an easement.

Currently pending before the Court are motions to dismiss the Amended Complaint [ECF No. 12] filed by each defendant for lack of subject matter jurisdiction or failure to state a claim. [ECF Nos. 14, 19, 21]. For the reasons that follow, the motions to dismiss are GRANTED.

## I.  BACKGROUND

The relevant history of the land in the Town of Aquinnah (previously known as Gay Head) begins with a large-scale partition of Native American common land that occurred over one hundred years ago. This historical background is not in dispute and has been chronicled in several prior cases involving Decoulos, most recently by the SJC:

> For much of the Nineteenth Century, a guardianship system managed the Native American tribes. Under this system, Native Americans were designated "involuntary wards of the State" where they could not sue or be sued, enter into legally binding contracts, or sell land to people outside of their own tribe. In the mid-Nineteenth Century, the Legislature began to depart from a paternalistic system of governance and move toward granting Native Americans full citizenship. Over the years, the Legislature appointed commissioners and committees to visit the Native American tribes and assess the tribes' condition, their way of life, and whether citizenship would be in their best interest.

> In 1862, the Legislature established the district of Gay Head. Before the [partition] at issue in this case, Gay Head consisted of about 2,400 acres, of which about 450 acres were held in severalty and the remainder was held by the [Wampanoag Tribe of Gay Head ("Tribe")] in common . . . .

> As the boundary lines were being determined in Gay Head, the Legislature granted Native Americans full citizenship. While other tribes were able to take full advantage of their citizenship status, the Tribe at Gay Head remained an aberration. Because Gay Head had not been incorporated as a town, the Tribe could not freely enjoy the newly acquired benefits of citizenship such as voting at town meetings or electing town officers . . . . [A] committee of Massachusetts Senators and Representatives visited Gay Head to determine whether it should be incorporated as a town . . . [and] unanimously recommended that the district of Gay Head be incorporated as a town. The Legislature responded quickly and officially

incorporated the town of Gay Head. The Legislature simultaneously established a process by which the members of the Tribe could choose to partition the common land. "[A]ny ten resident owners of land" or, in the alternative, the selectmen of Gay Head may petition the probate court to initiate a division of the common land. After notice and a hearing, if a probate judge determined that it was in the best interest of the parties for the common land to be divided, the judge would appoint commissioners to partition the land.

In September, 1870, seventeen Gay Head residents petitioned a probate judge in Dukes County to divide the common land for the residents to hold in severalty. Court records reveal that after a hearing at which no one objected, Theodore Mayhew, a probate judge in Dukes County, concluded that the partition would be beneficial for the residents of Gay Head. Joseph L. and Richard L. Pease were appointed commissioners. In addition to partition, Richard Pease also was assigned to determine the boundary lines between the common land and the land held in severalty. The commissioners completed the partition in 1878. The land was divided into more than 500 lots. Not one lot included an express easement of access. As a result, the majority of the lots divided from the common land were landlocked. The commissioners expressly included a right of access over three lots to a creek for the purpose of fishing. They also reserved to certain lots the right to remove peat from other lots.

At the time of the division, there was an existing road that provided access from the Gay Head lighthouse to Chilmark, the neighboring town to the east. The road was in such "deplorable condition" that the committee in 1870 insisted that the Legislature repair the road. However, the lots at issue in this case did not abut this road. Over the past one hundred years, the landscape of Gay Head has changed. There are other roads in existence, such as the Moshup Trail that was created decades after the partition of the common land. The plaintiffs' lots do not abut these roads and remain landlocked.

Kitras II, 49 N.E.3d at 202−04 (internal citations omitted).

Decoulos owns the eastern half of Lot 557 (the "Property"), which is one of the lots that was divided from the common land. Am. Compl. ¶¶ 5, 41, 69. On December 18, 1964, Lot 557 was divided into two equal parts and the eastern half, which is now owned by Decoulos and is the subject of this litigation, was acquired by the Brutus Realty Trust on July 6, 1998. Id. ¶¶ 68−70, 158−59. At the time of the acquisition, Anthony C. Frangos was the sole trustee of the Brutus Realty Trust, and Decoulos was a beneficiary of the trust. Id. ¶¶ 158−59. On May 6, 2004, Decoulos was named a co-trustee of the Brutus Realty Trust, and in December 2008, he

3

became the sole trustee after Frangos passed away. Id. ¶¶ 169, 176. On May 5, 2017, Decoulos deeded the Property to himself in his individual capacity. Am. Compl. ¶ 187. Decoulos has claimed and continues to claim that an easement exists through Lot 556 to allow access from the Property to the Moshup Trail. Decoulos v. Town of Aquinnah, No. 17 MISC 000428 (HPS), 2017 WL 5907489, at *1 (Mass. Land Ct. Nov. 29, 2017). Lot 556 is owned by the Town. Am. Compl. ¶¶ 160−163.

## II.    PROCEDURAL HISTORY

Decoulos has previously litigated the same or similar issues raised in this case, albeit in a variety of representative capacities and with respect to several other plots of land in Aquinnah.

### A.    1997 Action in State Court (Kitras)

On May 20, 1997, Decoulos' wife Maria Kitras, as the trustee of Bear Realty Trust and the co-trustee of Bear II Realty Trust and Gorda Realty Trust (the "Bear Trusts"), filed a complaint against the Town and others in the Massachusetts Land Court seeking a declaration that easements by necessity were created by the 1878 partition of Native American common land. See Kitras et al. v. Town of Aquinnah, 833 N.E.2d 157, 162 (Mass. App. Ct. 2005) ("Kitras I"); [ECF No. 15-1 at 148−56]. Decoulos, as the co-trustee of Bear II Realty Trust and Gorda Realty Trust, joined Kitras as a plaintiff in the case. Kitras I, 833 N.E.2d at 162. The Bear Trusts claimed ownership of the lots numbered 178, 232, 243, 711, and 713. Id. In addition to seeking an easement by necessity, the complaint included claims for a prescriptive easement, a private way by prescription, and a public way by prescription. [ECF No. 15-1 at 148−156].

In June 2001, a Land Court judge allowed the defendants' motion to dismiss the Kitras action. Kitras II, 49 N.E.3d at 201. The judge concluded that the United States was an indispensable party because any easement by necessity found on the plaintiffs' properties would

4

burden neighboring lands that were owned by the Tribe, but were held in trust by the United States, pursuant to a 1983 settlement agreement.[1] Id.; see Kitras I, 833 N.E.2d at 162. The plaintiffs appealed, and in 2005, the Massachusetts Appeals Court determined that before addressing whether the United States was an indispensable party, the lower court "first had to decide whether easements by necessity could be implied for all or some of the lots." Kitras II, 49 N.E.3d at 201; see Kitras I, 833 N.E.2d at 163. The Appeals Court concluded that "lots numbered 189 and above were created by the partition of the common land and, thus, had the requisite unity of title to establish an easement by necessity." Kitras II, 49 N.E.3d at 201. Accordingly, the case was remanded to the Land Court "to determine whether there was an intent to create easements affecting lots [numbered] 189 and above, and, if so, the scope of such easements." Id.

"On remand, [the Land Court] bifurcated the trial, addressing first whether rights of access were intended at the time of the partition in 1878, [which would have created] easements by necessity. If so, then the judge would decide the location and proper routes of such easements." Id. Focusing only on lots numbered 189 and above, the Land Court "concluded that easements by necessity did not exist because there was sufficient evidence to rebut the presumed intent of the grantor commissioners to create access easements." Id. at 201–02.

On appeal, a divided panel of the Appeals Court concluded that easements by necessity existed and remanded the case to the Land Court to determine their location. Id. at 202.

---

[1] Under the settlement agreement, the Tribe acquired several hundred acres of land, which were held by a state-chartered corporation with the United States acting as trustee, in exchange for relinquishing aboriginal claims to other lands within Aquinnah. Kitras I, 833 N.E.2d at 162. The United States enacted the Massachusetts Indian Land Claim Settlement Act of 1987 ("Settlement Act"), 25 U.S.C. § 1771, to codify the terms of the settlement agreement. See Kitras II, 49 N.E.3d at 208 n.18 (citing Bldg. Inspector & Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 818 N.E.2d 1040, 1043−45 (Mass. 2004)).

Thereafter, the SJC granted further appellate review. Id.; see Kitras v. Town of Aquinnah, 22 N.E.3d 981, 983 (Mass. App. Ct. 2015), rev'd, 49 N.E.3d 198 (Mass. 2016). On April 19, 2016, the SJC affirmed the judgment of the Land Court that the plaintiffs were not entitled to easements by necessity on their lots because they failed to sufficiently show that such easements were intended by the commissioners who partitioned the land. Id. at 210–11. The plaintiffs filed a petition for a writ of certiorari, which was denied on November 28, 2016. See Kitras v. Town of Aquinnah, 137 S. Ct. 506 (2016).

**B.      2002 Action in Federal Court (Frangos)**

While Kitras was pending in state court, Frangos, as trustee of the Brutus Realty Trust, sued the Town and a private landowner in federal court on June 10, 2002, seeking to establish an easement by necessity over Lot 556 (owned by the Town) to access Lot 557 (the lot at issue here), and claiming that the denial of such an easement constituted an unconstitutional taking. See Frangos v. Town of Aquinnah, No. 02-cv-11159-MLW (D. Mass. June 10, 2002); [ECF No. 15-1 at 175−82]. Although Decoulos was not a party to the action, he was a beneficiary of the Brutus Realty Trust when the case commenced. See Am. Compl. ¶¶ 70, 158−59. Thus, this 2002 action involved both Lot 556 and the Property and the claims were nearly identical to those at issue here and in Kitras. See Am. Compl. ¶¶ 165−168.

On August 22, 2003, Judge Mark L. Wolf dismissed the action without prejudice because (1) the Commonwealth was a necessary party to the easement claim, but was barred from suit by sovereign immunity, and (2) the takings claim was not ripe for review in federal court because the plaintiff had not exhausted the available state-law remedies. See Frangos v. Town of Aquinnah, No. 02-cv-11159-MLW (D. Mass. Aug. 22, 2003), ECF No. 27 ("Frangos"); [ECF No. 15-1 at 80−93]. On May 27, 2004, the First Circuit dismissed the plaintiff's appeal of

_Frangos_ after the plaintiff failed to file an opening brief. See _Frangos v. Town of Aquinnah_, No. 02-cv-11159 (1st Cir. May 27, 2004) [ECF No. 15-1 at 95].

C.  **2004 Action in Federal Court (_Decoulos I_)**

Three days after the dismissal of _Frangos_, on August 25, 2003, Decoulos (as co-trustee of Bear II Realty Trust and Gorda Realty Trust) and Kitras (as trustee of Bear Realty Trust and co-trustee of Bear II Realty Trust and Gorda Realty Trust), filed a new action in federal court against the Town and others concerning the same lots at issue in _Kitras_. See _Kitras v. Town of Aquinnah_, No. 03-cv-11590-NMG (D. Mass. Aug. 25, 2003); [ECF No. 15-1 at 186−211]. The plaintiffs brought claims (1) seeking a declaratory judgment stating that the decisions of the Massachusetts Land Court clouded the title to the plaintiffs' land, (2) alleging an improper taking through the denial of easements by necessity, (3) asserting a deprivation of the "reasonable use of their property," and (4) alleging a "conspiracy to interfere with civil rights" under 42. U.S.C. § 1985. _Kitras v. Town of Aquinnah_, No. 03-cv-11590-NMG (D. Mass. Nov. 25, 2003), ECF No. 17 at ¶¶ 158, 161−62, 166, 169.

On September 30, 2004, Judge Nathaniel M. Gorton held that under the _Rooker-Feldman_ doctrine, the court did not have jurisdiction over Counts I and II, because those counts improperly sought federal review of the judgments of the Massachusetts Land Court. See _Kitras v. Town of Aquinnah_, No. 03-cv-11590-NMG (D. Mass. Sept. 30, 2004), at ECF No. 55 at 7−8 ("_Decoulos I_") ("This court simply does not have jurisdiction to invalidate civil state court judgments."). Further, Judge Gorton dismissed Counts III and IV after concluding that neither count stated a claim upon which relief could be granted. _Id._ at 9−10 (plaintiffs "fail to articulate any federal right upon which the Town impinged" to sustain Count III and did not allege the essential component of "class-based animus" under Count IV). The plaintiffs' appeal of

Decoulos I was dismissed for lack of prosecution after they ignored several court orders to retain counsel for the trusts, which Decoulos and Kitras were attempting to represent *pro se*. See Kitras v. Town of Aquinnah, No. 05-2282 (1st Cir. Mar. 16, 2006); [ECF No. 15-1 at 78].

### D.     2004 Action in State Court (Brutus)

On June 2, 2004, Decoulos and Frangos, as co-trustees of Brutus Realty Trust, initiated a second state-court action against the Town and others, asserting claims for an easement by necessity between Lot 556 and Lot 557, and an unconstitutional taking under federal and state law based on defendants' denial of access to Lot 557. See Frangos v. Town of Aquinnah, Misc. Case No. 299511 (Mass. Land Ct. June 2, 2004) ("Brutus"). [ECF 15-1 at 49, 59−61]. On August 17, 2011, the court stayed the proceedings in the case, pending the outcome of Kitras II. [ECF No. 15-1 at 112−15] ("Order on Motion for Relief").

Following Kitras II and the denial of Decoulos' petition for a writ of certiorari, the Land Court issued an order dated December 14, 2016 stating that Decoulos could not represent the Brutus Realty Trust *pro se*, and directed him to retain counsel within thirty days. Id. at 114. The December 2016 order informed Decoulos that the case would be dismissed with prejudice if counsel did not file an appearance on behalf of the trust within the time allotted. Id. On January 10, 2017, the Land Court held a status conference to allow counsel to enter an appearance on behalf of the trust. Id. Decoulos failed to appear at the conference and counsel did not enter an appearance. Id.; [ECF No. 15-1 at 111] ("Judgment of Dismissal"). On January 11, 2017, the court issued a 15-day nisi order and a post-hearing order requiring Decoulos to timely reply to the court and show cause for not attending the status conference. Judgment of Dismissal at 111. The nisi order informed Decoulos that if he failed to respond to the order, the case would be dismissed. Id.; Order on Motion for Relief at 114. On January 17, 2017, without advising the

court, the trust filed a single justice appeal of the December 2016 order with the Appeals Court. Order on Motion for Relief at 115. On January 23, 2017, the Appeals Court denied the interlocutory appeal. Id.

On January 27, 2017, after plaintiffs failed to respond to either the nisi order or the post-hearing order, the Land Court dismissed Brutus with prejudice. Id. On February 6, 2017, plaintiffs filed a motion for relief from the judgment of the December 2016 order, and on February 8, 2017, Decoulos moved for relief from the dismissal of his interlocutory appeal. Id.; [ECF No. 15-1 at 117] ("Order on Second Motion for Relief"). On February 14, 2017, the motion for relief from the judgment of the December 2016 order was denied, and on February 15, 2017, the Appeals Court declined to rescind the dismissal of Decoulos' appeal. Order on Motion for Relief at 114; Order on Second Motion for Relief at 117. On February 22, 2017, Decoulos filed a second motion for relief from the December 2016 order and the dismissal of the case. Order on Second Motion for Relief at 116−17. On February 24, 2017, the Land Court denied Decoulos' second motion for relief from the December 2016 order with prejudice and stated that "Decoulos is hereby cautioned that further attempts to relitigate these arguments, which have now already been decided conclusively by this court and the Appeals Court, may be met with sanctions for frivolous conduct." Id. at 117. At no time during these proceedings did Decoulos retain counsel as instructed.

On May 12, 2017, Decoulos filed a motion to substitute parties with the Appeals Court, after he conveyed the Property to himself from the Brutus Realty Trust on May 5, 2017. See Decoulos v. Town of Aquinnah, No. 17 MISC 000428 (HPS), 2017 WL 5907489, at *3 (Mass. Land Ct. Nov. 29, 2017). The Appeals Court denied the motion without prejudice to renewal in the trial court, and on June 12, 2017, Decoulos filed a renewed motion in the Land Court. Id. On

June 16, 2017, the Land Court denied the motion, noting that "[t]he court has granted Decoulos numerous opportunities to properly file and be heard in this matter—and has been exceedingly lenient with him through these proceedings—yet he has repeatedly failed to take advantage of them." Id. The court further stated:

> In sum, this court finds Decoulos' actions to have caused needless and undue delay to the disposition of this case. Decoulos' delay in . . . transferring the property [to himself] is unreasonable and inexcusable, as was his refusal to secure counsel, his previous failure to appear, and his failure to respond to the [nisi order]. Decoulos has acted in bad faith by repeatedly ignoring the orders of this court and ignoring deadlines set to alleviate his own invalid actions. His present motion does not represent a change in course or attitude, but rather Decoulos' continuing insistence to proceed with a pattern of dilatory and bad faith conduct. Having already given him multiple warnings, this court will not allow that course of conduct to continue.

Id. On August 4, 2017, the Appeals Court dismissed Decoulos' appeal of the judgment with prejudice. Id. at *5.

### E.     2017 Action in State Court (Decoulos II)

On August 7, 2017, approximately two weeks before filing this case, Decoulos, in his individual capacity, filed an action in the Land Court against the Town and others with nearly identical claims as those presented in Brutus. See Decoulos v. Town of Aquinnah, Misc. Case No. 17 MISC 00042B (Mass. Land Ct. Aug. 7, 2017); [ECF No. 15-1 at 97−109]. He alleged (1) that as the owner the Property, he enjoys an easement by necessity over Town property, and (2) that the defendants' denial of access to Lot 557 is an unconstitutional taking under state law. [ECF No. 15-1 at 106−08].

On November 29, 2017, the Land Court granted the defendants' motion to dismiss on the grounds of claim and issue preclusion. Decoulos v. Town of Aquinnah, No. 17 MISC 000428 (HPS), 2017 WL 5907489, at *4–6 (Mass. Land Ct. Nov. 29, 2017) ("Decoulos II"). The court ruled that the 2004 Brutus action satisfied the elements of claim preclusion. The court also found

that <u>Kitras II</u> met the requirements for issue preclusion, because although Lot 557 was not specifically named in the lawsuit underlying <u>Kitras II</u>, the Land Court and the SJC determined in that case that lots numbered 189 and above (including Lot 557) were not entitled to easements by necessity. <u>Id.</u> On May 8, 2018, Plaintiff filed an application with the SJC for Direct Appellate Review of <u>Decoulos II</u>. [ECF Nos. 28, 32-1]. The application was denied on June 29, 2018. [ECF Nos. 32−34].

## III. LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most hospitable to the plaintiff's theory, and draw all reasonable inferences from those facts in favor of the plaintiff. <u>United States ex rel. Hutcheson v. Blackstone Med., Inc.</u>, 647 F.3d 377, 383 (1st Cir. 2011). Aside from the complaint, "within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice." <u>United States ex rel. Winkelman v. CVS Caremark Corp.</u>, 827 F.3d 201, 208 (1st Cir. 2016). Such facts include documents from prior state court adjudications. <u>Giragosian v. Ryan</u>, 547 F.3d 59, 66 (1st Cir. 2008).

Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action" is not enough. <u>Id.</u> To avoid dismissal, a complaint must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." <u>Gagliardi v. Sullivan</u>, 513 F.3d 301, 305 (1st Cir. 2008) (internal quotations and citation omitted).

Further, the facts alleged, when taken together, must be sufficient to "state a claim to

relief that is plausible on its face." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570). "The plausibility standard invites a two-step pavane." Id. "At the first step, the court 'must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). "At the second step, the court must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal quotation marks omitted). "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." Sepulveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

Because Decoulos is proceeding *pro se*, the Court will construe his allegations liberally. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). However, Decoulos still must comply with procedural and substantive law. Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). Accordingly, dismissal of a *pro se* complaint is appropriate when the complaint fails to state an actionable claim. Muller v. Bedford VA Admin. Hosp., No. 11-cv-10510-DJC, 2013 WL 702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001)).

Challenges to the Court's subject matter jurisdiction, such as assertions of sovereign immunity, are brought under Federal Rule of Civil Procedure 12(b)(1). Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362–63 (1st Cir. 2001). A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "'is subject to the same standard of review' as a motion to dismiss under Rule 12(b)(6)." Breda v. McDonald, 153 F. Supp. 3d 496, 499 (D. Mass. 2015) (citing Castino v. Town of Great Barrington, No. 13-cv-30057-KPN, 2013 WL 6383020, at *1

(D. Mass. Dec. 4, 2013)). Courts may, however, consider evidence outside the pleadings in determining jurisdiction. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002), as corrected (May 8, 2002).

## IV.    DISCUSSION

### A.    The Commonwealth

The Commonwealth invokes sovereign immunity under the Eleventh Amendment as a jurisdictional bar to Decoulos' claims. Decoulos does not address any of the Commonwealth's immunity arguments.[2] "The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals," Pastrana-Torres v. Corporacion De P.R. Para La Difusion PUBLICA, 460 F.3d 124, 126 (1st Cir. 2006) (quoting Hess v. Port Auth. Trans−Hudson Corp., 513 U.S. 30, 39 (1994)), unless the state or Congress has validly abrogated a state's immunity through "appropriate legislation," or the state itself has elected to waive its immunity by consenting to suit. Davidson v. Howe, 749 F.3d 21, 28 (1st Cir. 2014). If the legislature intends to abrogate the state's sovereign immunity, its intentions must be "unmistakably clear in the language of the statute." Id. Similarly, a state can waive its own immunity "by clear declaration that it intends to submit itself to the jurisdiction of a federal court, . . . by participating in a federal program that requires waiver of immunity as an express condition, . . . or by affirmative litigation conduct." Id. (internal citations omitted).

Here, the Commonwealth asserts that it has not consented to this suit and Decoulos

---

[2] Decoulos' opposition to the Commonwealth's motion reiterates his disagreement with the SJC's reasoning in Kitras II and presents his theory on the merits that Kitras II amounts to a "judicial taking," relying solely on the plurality opinion in Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection, 560 U.S. 702, 715 (2010). The Court need not reach the merits of these arguments given the clear applicability of sovereign immunity.

provides no allegation or evidence to the contrary. A state may consent to suit in federal court by "evinc[ing] a clear choice to submit [the state's] rights for adjudication by the federal courts," through the removal an action from state to federal court or the filing of a counterclaim in federal court. Ramos-Pinero v. P.R., 453 F.3d 48, 52 (1st Cir. 2006). In this case, the Commonwealth has only appeared in this action to move for dismissal on the basis of its Eleventh Amendment immunity, which is "hardly" evidence of an unambiguous choice to submit the adjudication of its rights to the federal court. Id. (concluding that Commonwealth of Puerto Rico "did not waive [its] immunity by filing a motion to dismiss").

To find that the Commonwealth's immunity was abrogated through legislation, the legislature must have enacted a law "which express[es] its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." Lane v. First Nat'l Bank of Bos., 871 F.2d 166, 168 (1st Cir. 1989) (internal quotation marks and citations omitted). Decoulos does not reference and the Court is not aware of any state or federal statute that abrogates the Commonwealth's immunity with respect to the claims asserted in the Amended Complaint. In further support of applying the bar of sovereign immunity here, Judge Wolf has already concluded that sovereign immunity prevented the Commonwealth from being joined in the Frangos action filed by Kitras and Decoulos, see Frangos, No. 02-cv-11159-MLW at 11, and the First Circuit has held that in the related "context of compensation for reverse condemnation claims, . . . the Eleventh Amendment bars federal courts from granting this relief." Vaqueria Tres Monjitas, Inc. v. Irizarry, 600 F.3d 1, 9 n.9 (1st Cir. 2010) (Lynch, C.J., dissenting); see Citadel Corp. v. P.R. Highway Auth., 695 F.2d 31, 33 n.4 (1st Cir. 1982) ("Even if the constitution is read to require compensation in an inverse condemnation case, the Eleventh Amendment should

prevent a federal court from awarding it.").[3]

Accordingly, the Commonwealth's motion to dismiss on the basis of sovereign immunity is granted.

**B.** **The Town and the AGHCA**

The Town and the AGHCA move to dismiss based on the <u>Rooker-Feldman</u> doctrine, res judicata, and failure to state a plausible claim for relief. The AGHCA also contends specifically that, as a private nonprofit organization, it cannot provide Decoulos with the requested easement, nor can it be liable for an unconstitutional taking or denial of due process.

1.    <u>Rooker-Feldman</u>

The <u>Rooker-Feldman</u> doctrine establishes that federal district courts lack jurisdiction to hear a *de facto* appeal of a state-court judgment from the losing party. When a state-court litigant seeks federal review of a "final state-court judgment[]," the Supreme Court has exclusive jurisdiction. <u>Lance v. Dennis</u>, 546 U.S. 459, 463 (2006) (citing <u>D.C. Ct. App. v. Feldman</u>, 460 U.S. 462, 482 (1983)); <u>see also</u> 28 U.S.C. § 1257. <u>Rooker-Feldman</u> "applies only to (1) a party who lost in a state-court judgment that (2) was rendered before the federal action commenced,

---

[3] The Supreme Court created an exception to Eleventh Amendment immunity for certain cases where "prospective declaratory or injunctive relief is sought" concerning "a state official's action." <u>Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza</u>, 484 F.3d 1, 24 (1st Cir. 2007) (quoting <u>Mills v. Maine</u>, 118 F.3d 37, 54 (1st Cir. 1997)); <u>see</u> <u>Seminole Tribe of Fla. v. Fla.</u>, 517 U.S. 44, 732 (1996) ("[S]ince our decision in <u>Ex parte Young</u>, 209 U.S. 123 (1908), we often have found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." (internal quotation marks omitted)). Here, the Amended Complaint does not seek prospective relief, only damages and a declaration that defendants have violated Decoulos' rights. <u>See</u> <u>Surprenant v. Mass. Tpk. Auth.</u>, 768 F. Supp. 2d 312, 319 n.10 (D. Mass. 2011) ("As the Court observed in [<u>Mills</u>, 118 F.3d at 55], an award of prospective declaratory relief that has 'much the same effect as a full-fledged award of damages or restitution by the federal court' is the kind of relief prohibited by the Eleventh Amendment."). Decoulos also has not brought this suit against a state official. Accordingly, the exception to Eleventh Amendment immunity for certain actions seeking prospective relief is inapplicable.

where (3) the party complains of injuries caused by the state-court judgment and (4) invites district court review and rejection of those judgments." <u>DuLaurence v. Telegen</u>, 94 F. Supp. 3d 73, 79 (D. Mass. 2015), <u>aff'd</u>, No. 15−1537, 2016 WL 10454553 (1st Cir. Nov. 30, 2016) (citing <u>Silva v. Massachusetts</u>, 351 Fed. App'x. 450, 454 (1st Cir. 2009)). The doctrine also "precludes courts from exercising subject matter jurisdiction where the issues presented in the case are 'inextricably intertwined' with questions previously adjudicated by a state court, such that the federal district court would be in the unseemly position of reviewing a state court decision for error." <u>Mills v. Harmon Law Offices, P.C.</u>, 344 F.3d 42, 44 (1st Cir. 2003).

Decoulos plainly asserts that the SJC's decision in <u>Kitras II</u> injured him and asks this Court to review and reject that judgment. The Amended Complaint identifies <u>Kitras II</u> in the allegations in support of Count I (declaratory judgment) and Count II (unconstitutional taking), claiming that <u>Kitras II</u> "clouded the title" to his land and "completely destroyed the right to enjoy" the Property. Am. Compl. ¶¶ 195, 196, 201. Decoulos also implicitly refers to <u>Kitras II</u> in Count III when asserting that the "failure of the Massachusetts courts to allow plaintiff to argue the merits of access to his property has deprived him of due process," leading to an unconstitutional taking by inverse condemnation. <u>Id.</u> ¶ 204. In Count III, in a direct challenge to the SJC's holding in <u>Kitras II</u>, he also asks this Court to declare that "the elimination of implied easements to access [Lots 174 through 736] was arbitrary and irrational." <u>Id.</u> ¶ 205.

<u>Rooker-Feldman</u> applies to losing parties of state-court judgments, and has not been extended to non-parties that, for the purposes of preclusion law, "could be considered in privity with a party to the judgment." <u>Lance</u>, 546 U.S. at 466; <u>see also</u> <u>Johnson v. De Grandy</u>, 512 U.S. 997, 1006 (1994) (<u>Rooker-Feldman</u> did not bar action brought in federal court by plaintiff who "was not a party in the state court" and "was in no position to ask [a federal court] to review the

state court's judgment"). The Supreme Court has suggested, however, that there may be circumstances in which Rooker-Feldman applies against a party that was not precisely named in the state court proceeding, such as "where an estate takes a *de facto* appeal in a district court of an earlier state decision involving the decedent." Lance, 546 U.S. at 466 n.2. Here, Decoulos litigated Kitras as a co-trustee of the Bear II Realty Trust and Gorda Realty Trust which owned other lots subject to the same 1878 partition of the common land in Aquinnah, and then initiated the instant action in his individual capacity as the owner of the Property. Am. Compl. ¶¶ 5, 69−70, 124.

At first glance, Decoulos' circumstances appear to fall within the exception noted in Lance. Unlike in Lance or De Grandy, where the plaintiff was not involved in the prior action in any capacity, Decoulos was a losing party in Kitras II and is the plaintiff in the instant case. The distinction between the two actions is Decoulos' status as a representative of a trust in the first case and as an individual in the second. Kitras II expressly addressed not only the lots owned by the plaintiffs but all of the lots numbered 189 and above, including the Property in which Decoulos then held a beneficial interest and now owns outright. Thus, although Decoulos litigated Kitras II on behalf of a trust that owned other lots, he also effectively protected his own interests as the beneficial owner of the Property. See In re Fiorillo, 494 B.R. 119, 142 (Bankr. D. Mass. 2013) (Lance exception applied to the extent that bankruptcy trustee sought damages on behalf of state-court loser because trustee "stands in the shoes of the state court losing party"); Noone v. Town of Palmer, 2 F. Supp. 3d 1, 7 n.5 (D. Mass. 2014) ("The court believes that [case brought by heirs and executor of state court loser's estate] is one of those limited circumstances in which Rooker–Feldman, if otherwise available, can apply despite the lack of strict identity between the parties.").

Nonetheless, neither the Town nor the AGHCA provide any legal authority in support of the application of Rooker-Feldman where the state court loser acted in a representative capacity in the state court action but appeared as an individual in a subsequent federal court action. Given, however, the other dispositive deficiencies in Decoulos' claims as more fully set forth herein, the Court need not now determine the reach of Rooker-Feldman. See McVey v. McVey, 26 F. Supp. 3d 980, 995 n.45 (C.D. Cal. 2014) (where respondent appeared in state-court action in his individual capacity, but filed federal-court action in his trustee capacity, the court did not need to determine "whether the action [fell] within the limited exception recognized in Lance" because the action failed on the merits); Noone, 2 F. Supp. 3d at 7 ("The court, however, need not answer the Rooker–Feldman question as a threshold matter because other issues are clearly dispositive."); see also Chun Xin Chi v. Holder, 606 F.3d 6, 9 (1st Cir. 2010) ("Given that courts can bypass a close jurisdictional question if the merits ruling is 'foreordained' and does not create new precedent . . . we leave the issue for another day and turn to the merits." (internal citation omitted)).

## 2. Res Judicata

Res judicata is a broad term that collectively refers to both claim and issue preclusion. See Taylor v. Sturgell, 553 U.S. 880, 892 (2008). Claim preclusion "forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." Id. (internal quotation marks omitted). In contrast, issue preclusion (or collateral estoppel) bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." Id. at 892 & n.2. The Court applies the relevant state law of res judicata to determine the preclusive effect of state-court judgments, but applies federal preclusion law to determine the effect of prior federal court judgments. See Cruz v. Melecio, 204 F.3d 14, 18 (1st Cir. 2000) ("[S]tate law, with all its wrinkles, applies in

deciding the res judicata effect of a state court judgment in a federal court."); Apparel Art Int'l,

Inc. v. Amertex Enter. Ltd., 48 F.3d 576, 582 (1st Cir. 1995) ("Federal law principles of res

judicata govern the preclusive effect of a prior federal court's judgment on a subsequent action

brought in federal court.").[4]

The Town asserts that the judgments in Kitras II, Decoulos I, and Brutus preclude

Decoulos from bringing each of the claims alleged in the Amended Complaint.[5] Under both

federal and Massachusetts law, "[t]he doctrine of *res judicata* bars all parties and their privies

from relitigating issues which were raised or *could have been raised* in a previous action, once a

court has entered a final judgment on the merits in the previous action." FDIC v. Shearson-Am.

Express, Inc., 996 F.2d 493, 497 (1st Cir. 1993) (citing United States v. Alky Enters., Inc., 969

F.2d 1309, 1314 (1st Cir. 1992)); see also Kobrin v. Bd. of Registration in Med., 832 N.E.2d

628, 634 (Mass. 2005). Both federal and Massachusetts law require proof of three elements to

invoke claim preclusion: "(1) the identity or privity of the parties to the present and prior actions,

(2) identity of the cause of action, and (3) prior final judgment on the merits." Kobrin, 832

N.E.2d at 634 (quoting DaLuz v. Dep't of Corr., 746 N.E.2d 501, 505 (Mass. 2001)); see also

Shearson-Am. Express, 996 F.2d at 497 (citing Kale v. Combined Ins. Co. of Am., 924 F.2d

---

[4] While the Town seeks dismissal on both claim and issue preclusion, the AGHCA moves to dismiss Count I based only on issue preclusion because it was not a party to or in privity with the parties to the prior actions. See Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987) ("A nonparty may use collateral estoppel defensively against a party to the original action, who had a full and fair opportunity to litigate the issues in question."); 18 James Wm. Moore et al., Moore's Federal Practice - Civil § 132.04 (2018) ("[Issue preclusion] can be used as a shield by a new defendant against a plaintiff who was a party to the former litigation.").
[5] Because the court in Decoulos I denied the relevant claims on jurisdictional grounds and did not reach the merits, claim preclusion cannot be based on Decoulos I. See Muñiz Cortés v. Intermedics, Inc., 229 F.3d 12, 14 (1st Cir. 2000) ("[A] dismissal for lack of subject matter jurisdiction is not considered to be 'on the merits,' and therefore is without res judicata effect."). The Court nonetheless references the reasoning of Decoulos I, infra, given the similarity of the causes of action in Decoulos I, Kitras II, and this case.

1161, 1165 (1st Cir. 1991)).

a.  *Privity*

First, res judicata does not "require one to have been a party to a judgment in order to be

bound by it." Richards v. Jefferson County, 517 U.S. 793, 798 (1996). "'[S]ubstantive legal

relationship[s]' between the person to be bound and a party to the judgment," otherwise known

as privity, may justify the application of res judicata to a nonparty. Taylor, 553 U.S. at 894

(quoting D. Shapiro, Civil Procedure: Preclusion in Civil Actions 78 (2001)). "[T]here is no

generally prevailing definition of privity which can be automatically applied to all cases."

Degiacomo v. City of Quincy, 63 N.E.3d 365, 370 (Mass. 2016) (quoting Old Dominion Copper

Mining & Smelting Co. v. Bigelow, 89 N.E. 193, 327 (Mass. 1909)). "Instead, privity is best

understood simply as a legal conclusion that follows from an analysis of the relationship between

the parties to a prior adjudication and the party to be bound." Id.

Under Massachusetts law, "the determination whether a nonparty is in privity with a

party depends on the nature of the nonparty's interest, whether that interest was adequately

represented by a party to the prior litigation, and whether binding the nonparty to the judgment is

consistent with due process and common-law principles of fairness." Id.; Morganelli v. Bldg.

Inspector of Canton, 388 N.E.2d 708, 711 (Mass. 1979) (question of privity "depends on the

nature of the plaintiffs' interest, whether that interest was represented in [the prior litigation], and

whether there are special circumstances or due process considerations which make it unfair to

bind the plaintiffs to that judgment").

A nonparty may be bound to a judgment because his or her interests were "'adequately

represented by someone with the same interests who [wa]s a party' to the suit." Taylor, 553 U.S.

at 894 (quoting Richards, 517 U.S. at 798). "For example, a judgment that is binding on a

guardian or trustee may also bind the ward or the beneficiaries of a trust." <u>Richards</u>, 517 U.S. at 798; <u>see</u> <u>Taylor</u>, 553 U.S. at 895 ("Representative suits with preclusive effect on nonparties include . . . suits brought by trustees, guardians, and other fiduciaries." (citing <u>Sea–Land Servs., Inc. v. Gaudet</u>, 414 U.S. 573, 593 (1974))); <u>see also</u> 18 James Wm. Moore et al., <u>Moore's Federal Practice - Civil</u> § 131.40 (2018) ("[I]f a person appearing in a representative capacity has a personal interest in the outcome of the litigation, his or her status as a representative of other parties to the action will not shield that person from the operation of preclusion doctrines."). That being said, participation in a different capacity in a subsequent case, alone, does not warrant preclusion. <u>See</u> <u>Conte v. Justice</u>, 996 F.2d 1398, 1403 (2d Cir. 1993) ("[P]articipation as a guardian does not, without more, preclude a person's right to bring a subsequent personal cause of action."). The "general rule . . . that a party appearing in an action in one capacity, individual or representative, is not bound by res judicata in a subsequent action in which he appears in another capacity, does not apply in cases where, as here, the representative is also one of the 'beneficiaries' of the subject matter of the action." <u>Meagher ex rel. Pension Plan of Cement & Concrete Workers Dist. Council Pension Fund v. Bd. of Trs. of Pension Plan of Cement & Concrete Workers Dist. Council Pension Fund</u>, 79 F.3d 256, 257 (2d Cir. 1996); <u>see</u> Charles Alan Wright et al., Federal Practice & Procedure, § 4454 (2d ed. 2018) ("Preclusion may be appropriate . . . if the person who acted as representative in the first action had full opportunity and incentive to protect his own personal interests without courting any conflict of interest with those represented.").

Here, Decoulos initiated the <u>Brutus</u> action against the Town as a co-trustee of the Brutus Realty Trust, which owned the Property, while Decoulos himself held a beneficial ownership interest in the Property. Thus, as a beneficial owner of the Property, Decoulos held a significant

personal stake in the outcome of <u>Brutus</u>, and has an equivalent interest in the outcome of this case because he now owns the Property outright. Although Decoulos argues that the Brutus Realty Trust and he as an individual are not the same party, he does not suggest any reason that his individual interest was not adequately represented in <u>Brutus</u>, or that it would be unfair to bind him, as an individual owner of the Property, to the litigation that he initiated as the co-trustee and beneficiary of the same trust. See <u>Decoulos II</u>, 2017 WL 5907489, at *4 ("Decoulos was the plaintiff in [<u>Brutus</u>] as well as in the present action, and to the extent he claims his role as trustee in the first action defeats the complete identity of the parties, he, in his present status as plaintiff in his individual capacity, is in privity with himself in his capacity as trustee; he currently holds title to the Property and he filed the prior action as trustee of the [Brutus Realty Trust] when the [trust] held title to the Property."). Accordingly, as to Decoulos and the Town in <u>Brutus</u> and this case, the element of identity or privity of the parties is satisfied.

Decoulos' current status as an individual owner of the Property and his prior status as the co-trustee in <u>Kitras II</u> also satisfy the elements of privity. <u>Kitras II</u> impacted not only the lots owned by the plaintiffs in that action but all lots numbered 189 and above, including Lot 557, in which Decoulos held an interest during the <u>Kitras</u> litigation (as a beneficiary or trustee of the owning trust, or both). Although Decoulos litigated <u>Kitras</u> on behalf of trusts that owned lots other than the Property, he effectively represented his personal interests as the beneficial owner of the Property in claiming an easement by necessity that affected lots numbered 189 and above. See <u>Decoulos II</u>, 2017 WL 5907489, at *6 ("In [<u>Kitras II</u>], the SJC concluded that lots numbered 189 and above are not entitled to easements by necessity. The Property, the easterly half of lot 557, is thus covered by [<u>Kitras II</u>]," and Decoulos cannot "skirt around that decision by arguing that he sought easements for different lots in [<u>Kitras II</u>] that did not include the Property.").

Moreover, the Amended Complaint contains no allegations that distinguish the Property from the lots owned by the Bear Trusts. Here, Decoulos seeks a declaration that the Defendants clouded title "to land in Aquinnah" and deprived not only him but also the "original [grantees of lots numbered 189 and above] and their successors" of the power and right to own, alienate, and enjoy their property. See Am. Compl. ¶ 197. In his opposition, he argues that "the uses" and the "type of access being sought" for the Property were different from other lots. [ECF No. 24 at 7]. Decoulos cannot bolster the allegations of the Amended Complaint through the late addition of new facts in opposing a motion to dismiss. Klein v. MHM Corr. Servs., Inc., No. C.A. 08-11814-MLW, 2010 WL 3245291, at *2 (D. Mass. Aug. 16, 2010) ("For the purposes of deciding whether a plaintiff's factual allegations are sufficient in the context of a motion to dismiss under Rule 12(b)(6), the court may not look beyond the complaint to facts alleged solely in a plaintiff's moving papers."); Miller v. Suffolk Cnty. House of Corr., No. CIV.A.01-11331-DPW, 2002 WL 31194866, at *2 n.1 (D. Mass. Sept. 27, 2002) (declining to consider new allegation presented in opposition to motion to dismiss and collecting cases). Even if the Court considered Decoulos' new assertions, these vague statements that the properties were "different" do not plausibly suggest any conflict between his individual ownership of the Property and his representation of the trusts, given that Kitras II and the preceding lower court decisions in Kitras treated lots numbered 189 and above as on the same footing for purposes of determining whether easements by necessity existed. Because the Amended Complaint raises no plausible basis to infer that Decoulos represented the trusts in Kitras II in a manner that was not entirely consistent with his individual interest in the Property, Decoulos' individual capacity here is in privity with his trustee capacity in Kitras II. See Decoulos II, 2017 WL 5907489, at *6 (concluding that Decoulos "was . . . either a party or in privity with a party" in Kitras II).

b.    *Cause of Action*

Second, the identity of the cause of action is consistent between this case and both <u>Brutus</u> and <u>Kitras II</u>. Under the federal and Massachusetts laws of res judicata, the cause of action must arise from "a common nucleus of operative facts." <u>Apparel Art Int'l</u>, 48 F.3d at 583; <u>see</u> <u>Fed. Nat'l Mortg. Ass'n v. Brown</u>, 86 N.E.3d 247, 2017 WL 2130255, at *2 (Mass. App. Ct. May 16, 2017) (Massachusetts courts "look to whether '[the cause of action] is derived from the same transaction or series of connected transactions'" (quoting <u>Saint Louis v. Baystate Med. Ctr., Inc.</u>, 568 N.E.2d 1181, 1185 (Mass. App. Ct. 1991))). "Thus, if the claims asserted in [the instant action and a prior action]*, respectively, were sufficiently related, that is, if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong, the two suits advanced the same cause of action notwithstanding any differences in remedies sought or theories of recovery pleaded." <u>Kale</u>, 924 F.2d at 1166; <u>see</u> <u>Heacock v. Heacock</u>, 520 N.E.2d 151, 153 (Mass. 1988) (claim preclusion applies to "all matters that were or should have been adjudicated" in the prior action).

In <u>Brutus</u>, Decoulos sought a declaration that an easement by necessity existed over Lot 556 to Lot 557, and claimed that the denial of access to Lot 557 amounted to an unconstitutional taking under federal and state law. [ECF No. 15-1 at 59–62]. Here, Decoulos attempts to relitigate these same claims through Counts I and II by framing the injury and the unconstitutional taking as arising out the SJC's decision in <u>Kitras II</u>, where Decoulos presented a claim for an easement by necessity that implicated all lots numbered 189 and above.[6] Similarly,

---

[6] To the extent that Decoulos' declaratory judgment claim (Count I) challenges the holding in <u>Kitras II</u> as "ignoring" the Settlement Act, the SJC held in <u>Kitras II</u> that because that statute and the related settlement agreement occurred after the partition of the common land, those events were not relevant to the existence of an easement by necessity. <u>Kitras II</u>, 49 N.E.3d at 208 n.18.

Count III alleges that the failure to recognize an easement by necessity violated due process and resulted in an unconstitutional taking of his property. Am. Compl. ¶¶ 203−05. In Count III, Decoulos also expressly asks the Court to declare that the SJC's holding in Kitras II was "arbitrary and irrational." Id. at ¶ 205.

The claims in Kitras II, Decoulos I, Brutus, and the instant case all stem from the same nucleus of operative facts (the 1878 partition of the common land in Aquinnah and the subsequent regulation thereof) and seek redress for essentially the same basic wrong (the failure to recognize easements by necessity on the properties in which Decoulos holds an interest). Decoulos' claims in this case ostensibly hinge on Kitras II, which was decided after Decoulos initiated Brutus and Decoulos I. The SJC's decision in Kitras II is not a new development that is sufficient to establish a separate factual universe from Decoulos' prior cases; Kitras II is merely the appeal of the same easement claim that was asserted in Kitras beginning in 1997 and then reasserted in Brutus, Decoulos I, and now the instant case.[7] See Heacock, 520 N.E.2d at 153 (claim preclusion bars litigation of all matters that should have been adjudicated in the prior action "even though the [plaintiff] is prepared in a second action to present different evidence or legal theories to support his claim, or seeks different remedies"); Santos v. U.S. Bank Nat'l Ass'n, 54 N.E.3d 548, 554 (Mass. App. Ct. 2016) ("[R]es judicata principles prohibit parties from proceeding by way of 'piecemeal litigation, offering one legal theory to the court while holding others in reserve for future litigation should the first theory prove unsuccessful.'"

---

[7] Similar to Count I in this case, Decoulos sought a declaratory judgment in Decoulos I that the lower court rulings in Kitras clouded title to his property and violated the Settlement Act. Decoulos I, No. 03-cv-11590-NMG at 3. Judge Gorton determined that such a claim was "inextricably intertwined" with Kitras for the purposes of Rooker-Feldman. Decoulos now repackages that claim by replacing the lower court rulings in Kitras with the appellate decision of Kitras II. Id. at 7.

(quoting Bagley v. Moxley, 555 N.E.2d 229, 232 (Mass. 1990))). Regardless of how the various land parcels, representative capacities, and legal theories are arranged and rearranged, the prior actions and this case all derive from the same underlying facts and seek relief for the same alleged conduct. Accordingly, the cause of action is sufficiently identical between this case and Kitras II and Brutus.

c. *Final Judgment*

Third, Decoulos does not dispute that Kitras II was a final judgment on the merits. The SJC fully addressed the merits of his claim for an easement by necessity and his petition for a writ of certiorari was denied. Decoulos argues that Brutus did not reach a final judgment on the merits because the case was dismissed due to his failure obtain counsel to represent the Brutus Realty Trust. [ECF No. 24 at 9]. As the Land Court explained in Decoulos II when dismissing a similar count based on claim preclusion, "Decoulos is barred from relitigating his claims against the defendants because [the Land Court's] dismissal with prejudice of the [Brutus] complaint was an adjudication on the merits that became final when the Appeals Court dismissed the Trust's appeal with prejudice on August 4, 2017." Decoulos II, 2017 WL 5907489, at *5. See Jarosz v. Palmer, 436 Mass. 526, 536, 766 N.E.2d 482, 491 (2002) (stipulation of dismissal with prejudice is "accorded the same effect as a final judgment" because the judgment "would have no force if the parties were permitted to change their minds and relitigate the exact same claims against the same parties"); Mass. R. Civ. P. 41(b)(3) ("Unless the dismissal is [for lack of prosecution after three years], or unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision (b) and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, or for improper amount of damages . . . operates as an adjudication upon the merits.").

Decoulos also contends that he did not have a fair opportunity to litigate his claims in Brutus because the Land Court ordered him to obtain counsel and refused to substitute him as a new party after he acquired title to the Property in his individual capacity. Neither the Amended Complaint nor Decoulos' opposition brief provide any basis to conclude that the Land Court's order that he obtain counsel to represent the Brutus Realty Trust deprived him of a fair opportunity to litigate his claims. Further, it was Decoulos that violated multiple court orders and abandoned numerous opportunities to retain counsel on behalf of the trust. As the Land Court recounts:

> Decoulos's co-trustee passed away in 2008, but Decoulos did not transfer the Property to himself—to proceed *pro se* in his individual capacity—until May, 2017. The record reflects that Decoulos singularly proceeded as trustee of the Trust after Frangos's death; waiting nearly ten years before conveying the property to himself after multiple admonitions from the Land Court and Appeals Court against representing the Trust as a non-attorney. Decoulos argues that he is entitled to his day in court, yet he was not denied his day in court in [Brutus]; he deprived himself of that opportunity through his own actions, despite numerous chances to remedy the lack of representation for the Trust.

Decoulos II, 2017 WL 5907489, at *4. Here, Decoulos presents no supporting arguments to prove a deprivation of his right or opportunity to present his claims in Brutus. He also fails to show why the Land Court should have allowed him to substitute himself as a party after Brutus was dismissed with prejudice.

Therefore, both Brutus and Kitras II satisfy the elements of res judicata as between Decoulos and the Town. Each count in the Amended Complaint is therefore precluded as against the Town.[8]

---

[8] For substantially the same reasons, Count I of the Amended Complaint is also barred by issue preclusion. In Massachusetts, issue preclusion prevents the re-litigation of a factual or legal issue when "(1) there is a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion was asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication, was essential to the earlier judgment, and was actually litigated in the prior action." Decoulos II,

## C.    Remaining Claims Against the AGHCA

Although issue preclusion forecloses Count I against the AGHCA, the remaining claims against the AGHCA, as well as Count I, must also be dismissed for failure to state a claim.[9] The Amended Complaint contains no allegations that plausibly suggest that the AGHCA, as a private nonprofit organization, may be liable for the alleged cloud of title over Lot 557 or that Decoulos could obtain any relief from a judgment against the AGHCA. The only references to the AGHCA in the Amended Complaint concern the 1986 congressional testimony of the AGHCA's former president in support of the Settlement Act, see Am. Compl. ¶¶ 89–90, 97–104, and the allegation that the AGHCA filed an *amicus* brief in Kitras II. Id. ¶¶ 141–147. The AGHCA has not been a party to any of the prior actions discussed herein. Decoulos does not suggest that the AGHCA ever had a relationship with or held any interest in the Property. Lot 556, the lot over

2017 WL 5907489 at *5 (quoting DeGiacomo, 63 N.E.3d at 369). First, Kitras II resulted in a final judgment on the merits after the SJC affirmed the Land Court's holding that no easements by necessity exist over lots 189 and above. See Kitras II, 49 N.E.3d at 209–10. Second, as discussed above with respect to claim preclusion, Decoulos' capacity as co-trustee in Kitras II is in privity with his individual capacity in this case. Third, the question of whether an easement by necessity exists over Lots 189 and above was the central and determinative question decided by the SJC in Kitras II. See Jarosz, 766 N.E.2d at 489 (to be essential to the judgment, the issue "must have a bearing on the outcome of the case"). Here, Count I requests a declaratory judgment aimed at collaterally attacking the holding of Kitras II on the issue of whether easements by necessity exist over Lots 189 and above. Thus, the core issue that was actually litigated and was essential to the judgment in Kitras II is again presented here. Count I is therefore barred by issue preclusion against the Town and the AGHCA.

[9] To the extent that Count I is an attempt to enforce the Settlement Act against the Defendants, Decoulos lacks a private right of action to sue. "[T]he purpose of the statute was to remove all clouds on titles resulting from tribal land claims in Aquinnah (then Gay Head). The Act does not provide a private cause of action to third parties whose property has some relationship to the Wampanoag lands. As such, it cannot provide plaintiffs with a separate cause of action in this matter." Decoulos I, No. 03-cv-11590-NMG at 6; see Wiener v. Wampanoag Aquinnah Shellfish Hatchery Corp., 223 F. Supp. 2d 346, 351 n.8 (D. Mass. 2002) ("There is no private right of action in the [Settlement Act] to sue to enforce what is not so much an implicitly adopted congressional limitation on Massachusetts state power as a sanction for its exercise.").

which Decoulos seeks an easement to the Property, is owned by the Town, not the AGHCA. The mere filing of an amicus brief by a private non-party to the Kitras litigation does not plausibly link the AGHCA to any alleged injury or claim of relief relating to the existence of an easement, a governmental taking, or a violation of due process stemming from prior cases in which the AGHCA was not a party. Decoulos does not allege or argue that the AGHCA may be treated as a state actor against whom an unconstitutional takings claim or alleged due process violation might be plausible. See Philip Morris, Inc. v. Reilly, 267 F.3d 45, 55 (1st Cir. 2001) (unconstitutional takings result when "[g]overnment action . . . results in the permanent physical occupation of property or . . . denies the owner all economically beneficial use of his property" or when "government regulation goes to far"); Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 8 (1st Cir. 2015) (due process protections of the Fifth and Fourteenth Amendments bar only state action).

Therefore, Decoulos' "pleading is simply too conclusory" and is dismissed as to all counts brought against the AGHCA. Abolhassani v. Advanced Polymers, Inc., No. 09-cv-10519-PBS, 2009 WL 3246117, at *4 (D. Mass. Oct. 2, 2009) (citing Twombly, 550 U.S. at 555).

## V.    CONCLUSION

For the reasons stated herein, the motions to dismiss [ECF Nos. 14, 19, 21] are GRANTED and the case is DISMISSED.

**SO ORDERED.**

July 24, 2018                                          /s/ Allison D. Burroughs
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE